# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JOSE VIELMA, CARMEN NILDA CAPO-QUINONES, BERNEDETTE CRUZ, DIMARIE RODRIGUEZ, BERNICE DEJESUS, ISMAIL MORALES, OLGA M. DISLA-MENCIA, DIGNA ROSA-FERNANDEZ, MARELY MENENDEZ, KEINON CARTER, JUAN JOSE CUFINO RODRIGUEZ, JOAQUIN ROJAS, KALIESHA M. ANDINO, NORMAN ESTEVENT CASIANO-MOJICA, LEONEL MELENDEZ, RUBEN ENRIQUE GARCIA-TEJADA, CARLOS JAVIER PEREZ-ANGLERO, SANDY ROBERTS, KADIM RAMOS, CHRISTIAN ORTIZ-CARDONA, CARLOS B. MUNIZ-TORRES, JUAN ANTONETTI, JAVIER ANTONETTI, CARLEEN THOMAS, JOSE CARLOS RAMIREZ-MARTINEZ, ROLANDO JOSE RODRIGUEZ, EDWIN RIVERA ALVAREZ, NATHAN OROZCO, NICHOLAS PEREZ, COREY RICHARDS, VICTOR MALDONADO, MERCEDES GARCIA, MERCEDES A. MCQUERY, RONISE ROSE CELESTIN, OMAR DELGADO, JORDAN M. BOTELHO, JOSE ELMER PACHECO ANDRADE, ROBERT TEXIDOR-CARRASQUILLO, EMILY ANN PORTALATIN, JAMMY VALENTIN FERNANDEZ, MARIA SANFELIZ, NEREIDA RIBOT, MICHAEL GONZALEZ, ARACELIS MARIA JIMENEZ, MIGUEL VEGA, RODNEY SUMTER, JACKSON J. JOSAPHAT, JUAN GUERRERO, YAZMIN REYES, MARISSA DELGADO, DONALD BROWN, MAVELYN MERCED, CHRISTOPHER LITTLESTAR, CARLOS SANFELIZ, DIANA MONTES, CHRISTINE LEINONEN, NELSON

RODRIGUEZ and BIENVENIDO
ARACENA,

        Plaintiffs,

v.                                    Case No:  6:18-cv-884-Orl-40KRS

ADAM TODD GRULER, JOHN DOES 1-
20, JOHN DOES 21-30, CITY OF
ORLANDO and JOHN DOES 1-15,

        Defendants.

_____/

## ORDER

       This case involves unfathomable tragedy. On June 12, 2016, an armed gunman entered the Pulse nightclub and gunned down as many people as he could, killing and injuring dozens. In the aftermath of the horrific attack, Plaintiffs filed suit alleging constitutional deprivations by the City of Orlando and its officers for not preventing the massacre, not going in quickly enough to "neutralize" the shooter, and for unreasonable searches and seizures during the subsequent investigation. These Plaintiffs have suffered immeasurably, and if magnitude of loss determined whether Plaintiffs could recover, then they surely would. But Plaintiffs assert constitutional claims that are patently foreclosed by Supreme Court and Eleventh Circuit precedent that requires this Court to dismiss the suit.

       This matter is before the Court without oral argument on Defendants' Dispositive Motion to Dismiss (Doc. 49 (the "**Motion**")). Plaintiffs responded in opposition on September 28, 2018. (Doc. 55). With briefing complete, the matter is ripe. Upon consideration, the Motion is due to be granted and the case dismissed.

## I.    BACKGROUND[1]

The events giving rise to this suit begin the early hours of June 12, 2016. (Doc. 37, ¶¶ 76, 80). At that time, Defendant Adam Todd Gruler ("**Officer Gruler**"), a City of Orlando law enforcement officer, was on duty providing security at the Pulse nightclub in Orlando, Florida. (*Id.* ¶¶ 70, 78). By approximately 2:00 a.m., Officer Gruler had "abandoned his post." (*Id.*). Around this time, an individual (the "**Shooter**") entered Pulse intent on carrying out a mass shooting. (*Id.* ¶¶ 76–77). After scouting the club and seeing no security personnel, the Shooter went to his car to retrieve his weapons—a semi-automatic rifle and semi-automatic pistol. (*Id.* ¶¶ 76–78).

Upon re-entering Pulse, the Shooter opened fire on the patrons within. (*Id.* ¶ 81). When the shooting began, Officer Gruler "immediately became aware that an active shooter was shooting patrons in Pulse," but allegedly "stayed outside." (*Id.* ¶¶ 81–82). "[S]ome time" after the shooting started, Orlando law enforcement officers entered Pulse and engaged the Shooter, causing him to retreat into a restroom where he barricaded himself with several hostages. (*Id.* ¶¶ 84–85). Roughly three hours later, law enforcement entered Pulse and "neutralized [the] Shooter." (*Id.* ¶ 86). All told, forty-nine people were killed, and fifty-three injured, by the Shooter. (*Id.* ¶ 87).

Over the next ten hours, Defendants John Does 1–12—most alleged to be Orlando police officers[2]—detained, processed, and interviewed numerous Plaintiffs regarding the

---

[1]    This account of the facts is taken from the Second Amended Complaint (Doc. 7 ("**SAC**")). The Court accepts these factual allegations as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

[2]    *See infra* note 11.

shooting. (*Id.* ¶¶ 10, 88 ("**Detained Plaintiffs**")). Additionally, John Does 13–15 searched and seized personal property from numerous Plaintiffs "for weeks to months after the shooting." (*Id.* ¶¶ 11, 90 ("**Seized Property Plaintiffs**")).

Based on the officers' conduct, Plaintiffs initiated this action on June 7, 2018, alleging numerous constitutional claims related to the shooting. (Doc. 1). Fifteen days later, Plaintiffs filed an Amended Complaint (Doc. 18), which the Court dismissed without prejudice as a shotgun pleading. (Doc. 34). On August 15, 2018, Plaintiffs filed the SAC now before the Court. (Doc. 37). The SAC includes fifty-six named Plaintiffs, eighteen of whom are personal representatives of the estates of deceased victims of the shooting. (*Id.* ¶ 6). The remaining Plaintiffs were injured at Pulse, suffering gunshot wounds and/or non-physical injuries, such as post-traumatic stress disorder. (*Id.* ¶¶ 7–9, 12).

The SAC proceeds in four Counts. Count I alleges 42 U.S.C. § 1983 claims on behalf of all Plaintiffs against Officer Gruler and the City of Orlando for Defendants' violation of Plaintiffs' "interest in life, liberty[,] and property and [] substantive due process right[s] protected by the 4th and 14th Amendments to the U.S. Constitution." (*Id.* ¶¶ 91–106). Count I is premised on Officer Gruler "abandoning his post" before the shooting and neglecting "to enter the club immediately after the shooting began to neutralize Shooter." (*Id.* ¶¶ 94–96). Count II avers § 1983 claims on behalf of Detained Plaintiffs against John Does 1–12 and the City of Orlando based on John Does 1–12 unlawfully arresting and/or detaining those Plaintiffs. (*Id.* ¶¶ 107–116). Count III asserts § 1983 claims on behalf of Seized Property Plaintiffs against John Does 13–15 and the City of Orlando based on the John Does seizing Plaintiffs' personal property without legal authority. (*Id.* ¶¶ 117–20). Finally, Count IV alleges a *Monell* claim against the City of Orlando based on a failure-to-

train theory. (*Id.* ¶¶ 121–34). Defendants move to dismiss all claims with prejudice. (Doc. 49).

## II.  STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1). Thus, in order to survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555. Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam). In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 67.

III.    **DISCUSSION**

Defendants seek dismissal of Count I because (i) it fails to state a plausible substantive due process claim, and (ii) Officer Gruler is entitled to qualified immunity. (Doc. 49). They also request dismissal of Counts I through III as against the City of Orlando because they fail to state a basis for municipal liability. (*Id.*). Furthermore, Defendants ask the Court to dismiss Counts II and III as against the Doe Defendants because the SAC impermissibly pleads fictitious defendants. (*Id.*). Finally, Defendants move to dismiss Count IV against the City of Orlando for failure to state a claim. On review, the Court agrees and holds the SAC is due to be dismissed in its entirety.

Before analyzing the SAC's claims, the Court takes note of the animating principles of the laws on which Plaintiffs' claims rest. Plaintiffs rely on 42 U.S.C. § 1983 to support each of their claims. Section 1983 vests individuals whose federal rights are violated by persons acting under color of state law with a federal cause of action. Congress enacted the Civil Rights Act of 1871—§ 1983's parent statute—in response to "the campaign of violence and deception in the South, fomented by the Ku Klux Klan, which was denying decent citizens their civil and political rights." *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). Before the law passed, "murder," "whipping," and "lynching" were commonplace and "local administrations [were] found inadequate or unwilling to apply the proper corrective." *Id.* (quoting Cong. Globe, 42d Cong., 1st Sess., 374 (1871) (remarks of Rep. Lowe)).

Section 1983 was therefore created to empower federal courts to vindicate the federal rights of individuals harmed by those acting with actual or apparent state law authority. Indeed, "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect

the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (citations omitted). To that end, § 1983 is a vehicle through which individuals can bring constitutional and federal claims against those clothed with state authority.

One such claim is a Fourteenth Amendment substantive due process claim. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Like § 1983, the Due Process Clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)).[3] Individuals whose due process rights have been violated by state actors may sue the state-actor violators under § 1983. As a general matter then, the Fourteenth Amendment is not implicated by acts of private violence.

Fourteenth Amendment substantive due process protections do not "entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Neither is the Due Process Clause a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). The Constitution, instead, deals with "the large concerns of the governors and the governed." *Id.*

---

[3] *See also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

## A.    Count I Against Officer Gruler

The Court begins with Count I's substantive due process claims against Officer Gruler.

### 1.    DeShaney *and its Progeny Preclude Count I Against Officer Gruler*

Before addressing the SAC, the Court submits the following overview of important precedent in this area, which illustrates why Plaintiffs' claims fail.

It has long been held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. That principle stems from the *DeShaney* case which, like this one, had tragic facts worthy of recitation. The plaintiffs there were guardians of a four-year-old who claimed that the Department of Social Services failed to protect the child from his father's beatings which resulted in irreversible brain damage. *Id.* at 193. Over twenty-six months, the department was repeatedly notified of ongoing abuse but failed to act. *Id.* at 192. The plaintiffs brought substantive due process claims against the department for "failing to intervene to protect [the child] against a risk of violence at his father's hands of which [the department] knew or should have known." *Id.* at 193.

Despite the department's notice of the threat and failure to act, the Supreme Court found no substantive due process violation, holding that the Due Process Clause provides no guarantee of government protection from private violence.

> The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.

*Id.* at 195. Thus, the Court affirmed the principle that the Due Process Clause affords no affirmative right to government aid, "even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

This principle was reaffirmed in another tragic case, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). There, Jessica Gonzales had obtained a Colorado restraining order limiting her estranged husband's contact with her and her three daughters. *Id.* at 751. One evening, Gonzales' daughters went missing. *Id.* at 753. She immediately called the police, alerting them that she suspected her estranged husband had taken them. *Id.* Gonzales contacted the police five times that night, and each time they did nothing. *Id.* at 753–54. Hours after the girls went missing, the estranged husband showed up at the police station and initiated a firefight with police, who shot and killed him. *Id.* at 754. Soon after, it was discovered that he murdered the girls and left them in his car. *Id.* at 754. Gonzales brought suit, asserting substantive and procedural due process claims, for the police's failure to enforce her restraining order.

The Supreme Court summarily found that Gonzales could not state a substantive due process claim because "the Due Process Clause does not 'requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors.'" *Id.* at 755, 769 (quoting *DeShaney*, 489 U.S. at 195). The Court likewise found that Gonzales could not state a procedural due process claim. *Id.* at 769. Faced with the question of whether Gonzales had a "legitimate claim of entitlement" in the police enforcing her restraining order, the Court held that a "benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id.* at 756, 760–61. "The practical

necessity for [police] discretion" warranted the conclusion that Colorado police were not under a mandatory duty to take specific action in response to restraining order violations. *Id.* at 762–63. Finally, the Court noted that the indeterminacy of the claimed entitlement— that police should have "use[d] every reasonable means, up to and including arrest, to enforce the order's terms"—demonstrated that the police did not owe Gonzales a mandatory enforcement duty. *Id.* at 763–64 ("Nor can someone be safely deemed 'entitled' to something when the identity of the alleged entitlement is vague."). The Supreme Court has thus consistently held that there is no substantive or procedural right to government protection from private harm.[4]

Following the high Court's direction, the U.S. Circuit Courts of Appeals have applied this principle in myriad cases. For instance, in *Tucker v. Callahan*, 867 F.2d 909, (6th Cir. 1989), the Sixth Circuit affirmed the dismissal of a suit bringing due process claims against a police officer who watched a brawl that rendered the plaintiff a quadriplegic but failed to intervene or summon emergency assistance. *Id.* at 910–14. In *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) (en banc), the Fourth Circuit found no substantive due process violation where police officers responding to a reported domestic dispute affirmatively promised the victim that the perpetrator would be arrested and

---

[4]  It is a different matter entirely where the state has already deprived someone of their liberty. Indeed, "the Due Process Clause of its own force requires that conditions of confinement satisfy certain minimal standards for pretrial detainees, for persons in mental institutions, for convicted felons, and for persons under arrest." *Collins*, 503 U.S. at 127 (citations omitted); *see also, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) (holding that the Due Process Clause guarantees detainees in mental institutions "adequate food, shelter, clothing, and medical care"); *Bell v. Wolfish*, 441 U.S. 520, 535, n.16, 545 (1979) (affording pretrial detainees minimal standards of protection under the Due Process Clause);

detained, but actually released the perpetrator who immediately returned to burn the victim's house down, killing her three children. *Id.* at 1172, 1174.

Closer to home, the Eleventh Circuit has consistently affirmed the proposition that "a person does not have a constitutional right under the Fourteenth Amendment to be protected from the criminal acts of third parties." *See, e.g.*, *Mitchell v. Duval Cty. Sch. Bd.*, 107 F.3d 837, 838 (11th Cir. 1997) (per curiam). In *Mitchell*, Richard Mitchell tried to call his father from the school's administration office to get a ride home, but school officials denied his entry, so he had to use an outside pay phone and wait there for his father to arrive. *Id.* Mitchell was then shot and killed by private actors while waiting for his ride. *Id.* The personal representative of Mitchell's estate sued the school board under the Due Process Clause. *Id.* The Eleventh Circuit summarily affirmed the district court's dismissal, citing *DeShaney* and rejecting the plaintiff's argument that the claim could proceed under a "special relationship" or "special danger" theory of Fourteenth Amendment liability. *Id.* at 838–40.

Against this backdrop, it is clear that Count I against Officer Gruler cannot survive. Since this entire circumstance begins and ends with a private actor, Officer Gruler cannot be sued for violating Plaintiffs' due process rights. Indeed, Count I boils down to a claim that Gruler initially absconded and then failed to protect Plaintiffs after the attack began. Yet, "[t]he affirmative duty of protection that the Supreme Court rejected in *DeShaney* is precisely the duty [Plaintiffs] rel[y] on in this case." *See Pinder*, 54 F.3d at 1174. Officer Gruler's alleged failure to protect Plaintiffs "against private violence simply does not constitute a violation of the Due Process Clause." *See DeShaney*, 489 U.S. at 197. The

Pulse shooting was a spontaneous act of violence carried out by "a thug with no regard for human life." (Doc. 37, ¶ 76). With this, Plaintiffs' substantive due process claims fail.

### 2. Officer Gruler's Conduct Does Not Shock the Conscience

Even if Count I was not precluded by the *DeShaney* rule, the SAC does not plausibly allege that Officer Gruler's conduct shocks the conscience. Count I is therefore due to be dismissed on this alternative ground.

To prevail on a substantive due process claim, plaintiffs must plead and ultimately prove official action that "shocks the conscience." *Lewis*, 523 U.S. at 846. The conscience-shocking standard was first articulated in *Rochin v. California*, 342 U.S. 165 (1952). There, the Supreme Court found that the illegal forced pumping of a detained suspect's stomach "shock[ed] the conscience" because it violated the "decencies of civilized conduct." *Id.* at 172–73. This amounted to a substantive due process violation.

Since then, the Supreme Court has been loath to recognize other circumstances where the "shocks the conscience" standard is met to support a substantive due process claim. In *Lewis*, the Court noted that even intentional harm seldom violates the Due Process Clause, and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" 523 U.S. at 846 (quoting *Collins*, 503 U.S. at 129). In defining this standard, the Court found that conduct intended to injure a person arbitrarily—i.e. government conduct disconnected from a legitimate government interest—"is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849 (citing *Daniels*, 474 U.S. at 331 ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.")). That means "negligently inflicted harm is categorically beneath the threshold

of [a] constitutional due process" violation. *Id.* at 849. Furthermore, this inquiry turns on the facts—it is not "subject to mechanical application in unfamiliar territory." *Id.*

In the context of police action, the Supreme Court has held that an even "higher standard of fault" is necessary to support a due process claim when police are required to act fast in the face of an emergency. *Id.* at 852–54. "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.* at 853 (quoting *Daniels*, 474 U.S. at 332). Furthermore, courts may "not use hindsight to judge the acts of police officers," and must instead consider "what [the officer(s)] knew (or reasonably should have known) at the time of the act." *Rodriguez v. Farrell*, 280 F.3d 1341, 1352–53 (11th Cir. 2002).

The Supreme Court expounded this rule in *Lewis*, where it addressed the competing courses of action a police officer must consider when responding in a split second to a dangerously-fleeing suspect. 523 U.S. at 853. There, police initiated a dangerous high-speed chase—prohibited by the sheriff's department's policy on pursuit— that ended with a collision that killed a teenage passenger on the motorcycle being pursued. *Id.* at 836–37. The teenager's estate sued, saying the instigation of this chase "shocked the conscience." *Id.* at 837, 854. The Supreme Court rejected that claim in light of the conflicting considerations an officer in that situation must grapple with. *Id.* at 853–55. Consequently, the Court found the officers' conduct was not so egregious as to shock the conscience. *Id.* at 854.

Like the officers in *Lewis*, Officer Gruler was faced with a sudden emergency and had no time to deliberate. He could have gone in immediately to face an uncertain threat,

potentially harming those inside in an attempt to neutralize the suspect, or alternatively stayed outside Pulse, called for backup, or set up a perimeter to secure the structure. He chose to momentarily leave his post and stayed outside when the gunshots began. In these circumstances, Officer Gruler's conduct does not "shock the conscience." Assuming the truth of the SAC's allegations and viewing the SAC in the light most favorable to Plaintiffs, Officer Gruler's conduct can conceivably be characterized as negligent—perhaps even reckless. But as noted above, even "precipitate recklessness" is insufficient to support a substantive due process claim. *See Lewis*, 523 U.S. at 853. "Regardless whether [Officer Gruler's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and [he may] not [be] called upon to answer for it under § 1983." *See id.* at 855. So Count I also fails because, *DeShaney* aside, Officer Gruler's alleged conduct does not "shock the conscience."[5]

### 3. Deliberate Indifference

Next, Plaintiffs attempt to salvage their substantive due process claims by advancing a deliberate indifference theory. (Doc. 37, ¶ 92). Like before, this fails.

Outside the custodial context, this claim is hard to come by. "[A]t the very least, [it] require[s] a showing of deliberate indifference to an *extremely great risk* of serious injury to someone in Plaintiffs' position." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1306 (11th Cir. 2003) (emphasis added). "To act with deliberate indifference, a state actor

---

[5] Mindful that the Court must accept the SAC's well-pled factual allegations as true for purposes of this motion, the Court notes for completeness that Officer Gruler left his so-called post outside Pulse before the shooting commenced to intercept an under-aged patron who had a habit of illegally sneaking into the club. Officer Gruler testified to this at criminal trial, and fairness to all concerned dictates inclusion of this fact.

must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety." *Id.* This standard is "sensibly employed only when actual deliberation is practical." *Lewis*, 523 U.S. at 851.[6]

Accordingly, the "deliberate indifference" standard for substantive due process claims is inapplicable to this case of unforeseen circumstances where actual deliberation was impractical. *See id.* But even if the deliberate indifference standard were applicable to this case, the SAC is bereft of factual allegations showing that Officer Gruler was aware of a risk that was "extremely great." *See Waddell*, 329 F.3d at 1306. The SAC does not allege any foreknowledge of the Pulse attack by any Defendants and offers no factual allegations establishing that nightclubs lacking visible security are under an "extremely great risk" of attack. *See id.* Thus, Officer Gruler's conduct was not deliberately indifferent to Plaintiffs' constitutional rights.

Plaintiffs cite several inapposite district court decisions in support of their argument that Officer Gruler's conduct was deliberately indifferent to Plaintiffs' constitutional rights. First, *Olson v. Barrett*, No. 6:13–cv–1886, 2015 WL 1277933 (M.D. Fla. Mar. 20, 2015). In *Olson*, police went to Shelly Olson's home one evening, in part to perform a suicide check. *Id.* at *1–3. Police questioned Ms. Olson in her home, then went outside to gather additional information, leaving her unattended. *Id.* at *3. Moments later, Ms. Olson retrieved a shotgun and shot herself in the chest. *Id.* "None of the officers provided Ms.

---

[6] By "deliberate indifference," the Supreme Court stressed that it did not mean to describe "'deliberation' in the narrow, technical sense in which it has sometimes been used in traditional homicide law." *Id.* at 851 n.11. (citing *Caldwell v. State*, 84 So. 272, 276 (Ala. 1919) (noting that "'deliberation here does not mean that the man slayer must ponder over the killing for a long time'"; rather, "it may exist and may be entertained while the man slayer is pressing the trigger of the pistol that fired the fatal shot[,] even if it be only for a moment or instant of time.")).

Olson with basic life support at this time, and no ambulance was called." *Id.* Paramedics arrived nine minutes after the gunshot, too late to save Ms. Olson's life. *Id.* at *4. Her estate brought a substantive due process claim, and the district court found that the complaint stated a plausible "medical indifference" claim based on officers' failure to "undertake any lifesaving actions" in the nine minutes that Ms. Olson laid on the ground dying in front of police without receiving any medical treatment. *Id.* at *9–11.

Plaintiffs' reliance on *Olson* is misguided. Unlike *Olson*, which involved a suicide attempt witnessed by police followed by nine minutes of inaction while Ms. Olson lay dying in front of police, the instant case stems from a prolonged emergency created by a well-armed assailant firing dozens of rounds inside a nightclub over several hours. The Court is not inclined to expand *Olson*'s narrow holding to the dramatically different facts of this case. *See White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999) (requiring the arbitrary and conscience-shocking standards "be narrowly interpreted and applied").

Second, Plaintiffs offer *Waldron v. Spicher*, No. 5:16-cv-658, 2017 WL 3972464 (M.D. Fla. Aug. 11, 2017) (Report & Recommendation), *adopted*, 2017 WL 3922946 (M.D. Fla. Sept. 7, 2017). *Waldron* is likewise unhelpful to Plaintiffs' case. In *Waldron*, police responded to an emergency call reporting an attempted suicide by Anthony Ybarra, Jr. *Id.* at *1. Mr. Ybarra tried to hang himself from a tree but was almost immediately noticed by family members and a neighbor who cut him down and began administering CPR. *Id.* When a deputy arrived, he instructed the person performing CPR to stop, told incoming emergency units not to hurry, and blocked paramedics from reaching Mr. Ybarra after they arrived. *Id.* at *1–2. Paramedics eventually reached Mr. Ybarra and resumed CPR "with life signs," but he died in the hospital a week later. *Id.* at *2. Mr. Ybarra's estate

brought a substantive due process claim for the police's "medical indifference," and at the motion to dismiss stage, the court found that the complaint stated a plausible claim. *Id.* at *6. The Court is unpersuaded by *Waldron* for the same reasons it is unmoved by *Olson*.[7] Finally, Plaintiffs' citation to *Pinkney v. Davis*, 952 F. Supp. 1561 (M.D. Ala. 1997) does not move the needle because that case involved defendants' alleged indifference to the medical needs of an individual detained by the Alabama Department of Corrections. *Id.* at 1563–65.

### 4. Qualified Immunity

Finally, the Court turns to Officer Gruler's qualified immunity argument. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects all officials except "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To do so, the plaintiff must make a two-part showing. First, the plaintiff must allege that the facts of the case, if proven to be true, would make

---

[7]  In fact, the court in *Waldron* discussed *Olson* at length, and found that the plaintiffs in both cases stated plausible medical indifference claims for similar reasons. *Id.* at *7–8.

out a constitutional violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, the plaintiff must show that the constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Because qualified immunity provides a complete defense from suit, "courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013).

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even in novel factual circumstances, "officials can still be on notice that their conduct violates established law . . . ." *Id.* at 741 (rejecting a requirement that previous cases have "materially similar" facts to give officials notice). For instance, officials may be on notice where "a broader, clearly established principle . . . control[s] the novel facts in [a] situations," or where conduct "so obviously violates th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

In this case, Plaintiffs can satisfy neither part of the two-part showing to establish that Officer Gruler is not entitled qualified immunity. As discussed *supra* Subsections III.A.1–3, Plaintiffs have not alleged facts that make out a constitutional violation. *See Pearson*, 555 U.S. at 232. And even if they had, Plaintiffs have not shown that the constitutional right at issue was "clearly established." *See id.* Plaintiffs rely on *Olson* and *Waldron* to demonstrate that the Pulse nightclub occupants had a "clearly established" constitutional right to Officer Gruler's assistance. (Doc. 55, p. 6). But as the Court's analysis *supra* Subsection III.A.3 makes clear, neither *Olson* nor *Waldron* supports the

proposition that Officer Gruler violated Plaintiffs' rights. Count I therefore fails to state a plausible claim against Officer Gruler, and even if it did, he is entitled to qualified immunity.

### B. Counts I–III Against Defendant City of Orlando

Count I also avers claims by all Plaintiffs against the City of Orlando. (Doc. 37, p. 16). However, the Complaint and Response to Defendants' Motion to Dismiss do not make clear the theory of liability Count I relies on for this Defendant. Indeed, the City of Orlando is not mentioned in the SAC's "GENERAL ALLEGATIONS" section (see Doc. 37, ¶¶ 76–90) or in the allegations specific to Count I (see *id.* ¶¶ 92–106). Count I incorporates by reference the SAC's "PARTIES" section, which mentions Defendant City of Orlando in a single paragraph.[8] That paragraph—which generically alleges that Defendant City of Orlando "had a duty to train and supervise its officers to ensure that they abide by the United States Constitution" and to enact policies consistent with the Constitution—by itself, fails to state a plausible *Monell* claim against Defendant City of Orlando. Paragraph

---

[8]   The paragraph in question states:

> Defendant CITY OF ORLANDO is a political subdivision of the State of Florida, and at all times relevant herein, was acting under color of state law. Defendant CITY OF ORLANDO's policies and procedures, and training or lack thereof, demonstrated deliberate indifference to the rights Plaintiffs, and that deliberate indifference caused the herein complained-of harm to take place. The City at all pertinent times had a duty to train and supervise its officers to ensure that they abide by the United States Constitution. It further had, at all pertinent times, an obligation to maintain, through its policymakers and/or decisionmakers, policies, procedures, customs, and/or protocols, both written, unwritten, de facto, or otherwise, that were in conformity with the United States Constitution. The Orlando Police Department was at all pertinent times under the control of Chief John W. Mina, who was at all pertinent times a policymaker and/or decisionmaker for the City of Orlando.

(*Id.* ¶ 72).

seventy-two is bereft of specifics, and instead stitches together a hodge-podge of legal conclusions and constitutional buzzwords. More is required to state a plausible claim. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). Counts II and III suffer from the same defect. They name Defendant City of Orlando but lack any allegations supporting liability. Because municipal governments may not be held liable under *respondeat superior* or vicarious liability for the constitutional wrongdoings of their agents, Counts I–III are due to be dismissed as to Defendant City of Orlando. *See City of Canton v. Harris*, 489 U.S. 378, 385 (2007); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).[9] The Court addresses the *Monell* claims asserted against Defendant City of Orlando in Count IV *infra*.

### C. Counts II and III Against John Doe Defendants

#### 1. *Impermissible John Doe Pleading*

Plaintiffs' first Amended Complaint alleged claims against thirty John Doe Defendants without including identifying information specific to any individual John Does. (Doc. 18). In an August 1, 2018, hearing (the "**August Hearing**"), the Court cautioned Plaintiffs of the problems associated with John Doe pleading. (*See, e.g.*, Doc. 35, pp. 5–9, 17–20). The same day, the Court entered an Order dismissing the Amended Complaint as a shotgun pleading. (Doc. 34). That Order noted Plaintiffs' "problematic use of John Doe Defendants," and cited the rules governing John Doe pleading as follows:

---

[9] To the extent the SAC pleads claims against Officer Gruler in his "official capacity" (Doc. 37, ¶ 73), such claims are construed as against the municipality (City of Orlando) and are likewise due to be dismissed. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))).

In federal court, "fictitious-party pleading is not permitted." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (per curiam). The Eleventh Circuit has permitted "a limited exception to this rule when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Id.*

(Doc. 34, p. 3 n.2).

Plaintiffs did not heed the Court's repeated warnings. Instead, Plaintiffs filed the SAC, which brought two Counts against fifteen Doe Defendants. (Doc. 37, ¶¶ 116, 120).[10] While the SAC contains some details about the Doe Defendants beyond the Amended Complaint,[11] given the state of the Amended Complaint, that's not saying much. Again,

---

[10] Although the SAC mentioned several individuals by name, the Court ignores these references because such individuals were omitted from the case caption. The SAC alleges that Plaintiff Nelson Rodriguez was interrogated by "John Doe FBI Agents more than three times, whom this Plaintiff can describe as FBI Agent Sarah Oats, three other FBI Agents and US Attorney James Mandolfo." (Doc. 37, ¶ 116.v). Neither Agent Sarah Oats nor US Attorney James Mandolfo are named in the SAC's case caption. "Pursuant to Federal Rule of Civil Procedure 10(a), a case caption must name all of [the] parties to a suit. If Plaintiff[s] wish[] to bring suit against a defendant, [they] must list them in the caption and include a factual basis against each which entitles [them] to relief." *Prunty v. Arnold & Itkin LLP*, No. 2:17-cv-506-FtM-99CM, 2017 WL 5971681, at *3 (M.D. Fla. Dec. 1, 2017); *see also Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (per curiam) ("This rule serves more than administrative convenience. It protects the public's legitimate interest in knowing all of the facts involved, including the identities of the parties."); *Blasingim v. Hill*, No. 1:08-CV-2117, 2008 WL 11320088, at *2 (N.D. Ga. Sept. 8, 2008) (collecting cases). Therefore, the Court will ignore the allegations regarding Sarah Oats and James Mandolfo.

[11] The SAC describes John Doe Officer 1 as "a middle-aged white male." (Doc. 37, ¶ 116.i). John Doe Officer 2 is described as "a male detective." (*Id.* ¶ 116.ii). John Doe Officer 3 is described as a "tall medium white Orlando Police Department Officer." (*Id.* ¶ 116.iii). "Orlando Police Officer Doe 4" is described as "one of the officers at the hospital." (*Id.*). John Doe Officer 5 is described as "a female police officer of the Orlando Police Department who wore a dark uniform." (*Id.* ¶ 116.iv). The SAC mentions, but does not describe, "John Doe FBI Agents" who interrogated Plaintiff Nelson Rodriguez. (*Id.* ¶ 116.v). John Doe Officer 6 is described as "the police officer in charge." (*Id.* ¶ 116.vi). John Doe Officer 7 is described as "a male of Asian descent." (*Id.* ¶ 116.vii). Subparagraph 116.viii mentions, but does not describe, John Doe FBI Agent 1 who detained Plaintiff Cory Richards. (*Id.* ¶ 116.viii). John Doe Officer 8 is described "as a built black male Orlando Police Officer." (*Id.* ¶ 116.ix). John Doe Officer 9 is described "as a blonde short[-]haired female officer." (*Id.*). Subparagraph

the SAC fails to describe a single Doe Defendant so specifically that use of their name would "be, at the very worst, surplusage." *See Richardson*, 598 F.3d at 738. Identifying Doe Defendants "simply by a title held by numerous other individuals . . . fails to provide the specificity required to avoid the fictitious-party pleading rule." *Isles v. Doe*, 3:18–cv–632, 2018 WL 2317969, at *2 (M.D. Fla. May 22, 2018).

What's more, "[a] fictitious name . . . , when the real defendant cannot be readily identified for service, is insufficient to sustain a cause of action." *Williams v. DeKalb Cty. Jail*, 638 F. App'x 976, 976–77 (11th Cir. 2016).[12] None of the Doe Defendants named in the SAC are described with adequate specificity to allow service of process. All that is known of the most-specifically-described Doe Defendant is his or her employer and general physical description. Most lack even these paltry details. Such descriptions are obviously inadequate to allow for service. Therefore, Counts II and III are due to be dismissed as against the John Doe Defendants. *Cf. Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992) (approving claim against fictitious defendant described as Chief of Alabama jail, where such "description was sufficiently clear to allow service of process on the 'Chief'").

---

116.ix mentions a third officer without attributing this officer "John Doe" status: Plaintiff Jordan Bothelo "was interrogated by a female, whom Plaintiff believes was a detective and of Spanish descent." (*Id.*). John Doe Officers 10 and 11 are mentioned but not described. (*Id.* ¶¶ 116.x–xi). John Doe Officer 12 is described "as [a] whi[t]e male officer with black hair." (*Id.* ¶ 116.xii). John Doe Officer 13 is described as a "female white officer about 5 feet 10 – 11 inches in height." (*Id.* ¶ 120.i). John Doe Officer 14 is mentioned but not described. (*Id.* ¶ 120.ii). John Doe Officer 15 is described only as "an FBI Agent." (*Id.* ¶ 120.iii).

[12] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

The conclusion that Plaintiffs' fictitious-defendant pleading warrants dismissal is bolstered by Eleventh Circuit caselaw, which has drawn fine distinctions in this area. "It is important to distinguish suing fictitious parties from real parties sued under a fictitious name. There may be times when, for one reason or another, the plaintiff is unwilling or unable to use a party's real name." *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992). The likelihood that pleading Doe defendants will be permissible increases where the plaintiff is *pro se*[13] and "where allegations in the complaint make clear the plaintiff could uncover the names through discovery." *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 F. App'x 857, 862 (11th Cir. 2014). These principles, however, have not been applied in this Circuit to sanction the use of fictitious-defendant pleading by counseled plaintiffs against a group of defendants described as vaguely as the Doe Defendants named in the SAC. *See Moulds v. Bullard*, 345 F. App'x 387, 390 (11th Cir. 2009) (per curiam) (affirming dismissal of claims against group of John Doe officers, some of whom the complaint "completely failed to describe," others the complaint described generally, "such as by indicating the duty stations to which they were assigned"). For these reasons, the claims against Doe Defendants are due to be dismissed.

### 2. Plaintiffs Do Not Qualify for the Limited-Discovery Exception

Plaintiffs seek to invoke an exception that the Court finds inapplicable. Plaintiffs argue that an exception to the fictitious-party rule allows fictitious-defendant pleading "if a plaintiff uses the discovery process to determine the identity of the defendants whose conduct has been described in the complaint." (Doc. 55, p. 10 (citing Wright & Miller, 5A

---

[13] District courts are required to give *pro se* plaintiffs additional leeway in pleading. *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008).

Federal Practice & Procedure, § 1321 (3d ed.))). To that end, Plaintiffs say fictitious-defendant pleading is appropriate where "a) the fictitious party is a real person whose identity is unknown, b) plaintiff contemporaneously seeks to ascertain the identity of the fictitious party through limited discovery, and c) the court finds that such proposed discovery is narrowly tailored and is likely to lead to identification of the fictitious party." (*Id.* (quoting *Quad Int'l, Inc. v. Doe*, No. 12–674–N, 2013 WL 718448, at *3 (S.D. Ala. Jan. 7, 2013))).

Plaintiffs fail to establish that the exception applies for several reasons. First, Plaintiffs have not contemporaneously sought to identify the fictitious party "through limited discovery." *See Quad Int'l*, 2013 WL 718448, at *3. In the August Hearing, Plaintiffs did not request limited discovery to ascertain the identities of the Doe Defendants. (Doc. 35). Instead, they maintained that the First Amended Complaint's fictitious-defendant pleading was appropriate (*Id.* at pp. 11–12), and that the Doe Defendants' identities would be revealed in the normal course of discovery. (*Id.* at p. 15). Moreover, Plaintiffs for the first (and only) time mention the limited-discovery exception in their response to Defendants' dismissal motion—and nowhere in that filing do they request limited discovery targeted at identifying the Doe Defendants. (Doc. 55). Conversely, Plaintiffs joined with Defendants in moving to stay discovery until Defendants' dismissal motion is resolved. (Doc. 51). Because Plaintiffs did not "contemporaneously seek[] to ascertain the identity of the fictitious party through limited discovery," they have failed to establish eligibility for the limited-discovery exception. *See Quad Int'l*, 2013 WL 718448, at *3.

Second, the fact that two Defendants are named in the SAC—Officer Gruler and the City of Orlando—precludes application of the exception. In *Quad Int'l*, the court limited

the scope of the exception to situations where "plaintiff knows of no party defendant which could be named and thus cannot otherwise bring suit." *Id.*[14] Plaintiffs did not discuss this requirement in the briefing, but it nonetheless renders the exception inapplicable to this case, as the SAC names other defendants. *See id.*; (Doc. 55).[15] Finally, Plaintiffs fail to establish the exception's third prong—that limited "discovery is narrowly tailored and is likely to lead to identification of the fictitious party."[16] *See Quad Int'l*, 2013 WL 718448, at *3. For these alternative reasons, the exception does not apply.

In sum, fictitious-party pleading "wreaks havoc on a defendant's ability to respond." (Doc. 35, p. 23). The SAC's failure to identify the Doe Defendants with substantial

---

[14] *See also id.* ("[T]he court makes no determination of the propriety of this procedure where plaintiff knows the identity of other defendants against whom discovery may proceed in the usual course of litigation, and where presently-unidentified defendants may be added by amendment once such discovery leads to identification of the Doe defendants.").

[15] In a similar vein, the Court stated at the August Hearing: "It's possible in this sort of case to file suit on the facts that you know, conduct discovery, and then file a separate suit as opposed to picking [thirty] John Does and hoping to fill it in later." (Doc. 35, p. 13). Despite this warning, Plaintiffs later filed the SAC, naming a large group of vaguely-described John Doe Defendants. (Doc. 37).

[16] In the August Hearing, Plaintiff's counsel stated: "I'm assuming that there's some sort of report somewhere, some sort of statement that was written where, when an officer took a statement from a person, he wrote down his own name and then he wrote down the plaintiff's name or the interviewee's name." (Doc. 35, p. 15). Plaintiffs likewise note in their brief that they "could reasonably identify Defendants who were assigned to work during the Pulse incident." (Doc. 55, p. 10). These unsubstantiated assumptions—that Plaintiffs could quickly and easily ascertain the identities of the thirteen Doe Defendants who allegedly violated Plaintiffs' rights—do not support the conclusion that limited discovery would identify the Doe Defendants. *Cf. Dean*, 951 F.2d at 1215 (concluding that discovery would reveal the Doe defendant's identity where named defendants were due to submit a Special Report identifying the Doe defendant).

specificity—and Plaintiffs' failure to meet the limited-discovery exception's requirements—requires dismissal of Counts II and III as against the Doe Defendants.

### D. Count IV Against City of Orlando

Last, the Court turns to Count IV, which alleges a *Monell* claim against Defendant City of Orlando for its failure to adequately train Officer Gruler and the Doe Defendants "in how to provide adequate security in public places that are highly susceptible to danger, and how to enter and neutralize an active shooter." (Doc. 37, pp. 26–30). Defendants move to dismiss Count IV on two grounds: (i) Count IV lacks an underlying constitutional violation; and (ii) Count IV fails to state a plausible claim. (Doc. 49, pp. 21–25). The Court agrees that dismissal is warranted on either ground.

First, Count IV fails because of the absence of an underlying constitutional violation. Indeed, a *Monell* claim is derivative of—and thus requires—an underlying constitutional violation. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986). As the Court concluded *supra*, the SAC fails to allege underlying constitutional violations by Defendant City of Orlando's officers. Count IV thus does not state a claim. *See Knight ex rel. Kerr v. Miami–Dade Cty.*, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."). But even if the SAC alleged an underlying constitutional violation, it fails to allege a custom or policy supporting *Monell* liability.

A plaintiff suing a municipality can recover under § 1983 if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Official municipal policy includes governmental leaders' decisions, as well as "practices so persistent and widespread as to practically have the force of law. These are

actions for which the municipality is actually responsible." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation and quotation marks omitted). To support a *Monell* claim, the official policy must be the "moving force behind the constitutional violation." *Harris*, 489 U.S. 378, 389 (1989) (alteration accepted).

Under certain circumstances, a local government may incur liability for failing to train its employees about their obligation to avoid violating citizens' rights. *Connick*, 563 U.S. at 61. Such a claim is only available where "a municipality's failure to train its employees in a relevant respect . . . amount[s] to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Id.* (alteration accepted) (quoting *Canton*, 489 U.S. at 388). Generally, "a pattern of similar constitutional violations by untrained employees" is necessary to establish the requisite deliberate indifference. *Id.* at 62. However, there is a second path to failure-to-train liability: the "single-incident" theory, which Plaintiffs rely upon here. *Id.* at 63–64; (Doc. 37, ¶ 122; Doc. 55, p. 12).

The single-incident theory was first mentioned in *Canton*. There, the Supreme Court hypothesized that a municipality could incur liability for failing to train its employees based on a single constitutional violation where, because of the employees' duties, the need for training is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The Court illustrated with the following example:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10 (citation omitted).

The theory was put to the test in *Connick*. John Thompson was convicted of attempted robbery after Orleans Parish District Attorneys failed to disclose to the defense exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963). *Connick*, 563 U.S. at 54. Because of this conviction, Thompson did not testify when he went to trial for murder, and he was again convicted. *Id.* After spending eighteen years in prison, the *Brady* evidence was discovered and both convictions were vacated. *Id.* Thompson was retried and acquitted. *Id.* at 56. Thompson sued the attorney's office for its policy of failing to adequately train its prosecutors on their *Brady* obligations. *Id.* at 57. The Supreme Court found that the attorney's office was not liable under the single-incident theory, holding "[t]he obvious need for specific legal training that was present in the *Canton* scenario is absent here." *Id.* at 64.

Like *Connick*, Count IV fails because Plaintiffs did not plausibly allege that the City of Orlando's failure to train officers on "security in public places that are highly susceptible to danger, and how to enter and neutralize an active shooter," (Doc. 37, ¶ 121), fits within the "narrow range of *Canton*'s hypothesized single-incident liability." *See Connick*, 563 U.S. at 64. As discussed more thoroughly above, Plaintiffs have not plausibly alleged that nightclubs are at such great risk of attack that a municipality's failure to train its police officers on how to respond and even "neutralize an active shooter" amounts to deliberate indifference. The incredibly specific training envisioned by Plaintiffs on responding to and *neutralizing* a hypothetical active shooter without violating anyone's constitutional rights bears no resemblance to the use-of-deadly-force training envisioned in *Canton*. Though municipalities would be wise to train their police officers on responding to active shooters,

failure to provide such training does not amount to a constitutional tort. *See Gaviria v. Guerra*, No. 17-23490, 2018 WL 1876124, at *7 (S.D. Fla. Apr. 19, 2018) ("Neither the Supreme Court nor the Eleventh Circuit has ever applied the single-incident liability exception."). Count IV thus does not state a plausible claim.

### E.    Leave to Amend

Plaintiffs are not entitled leave to amend. District courts must *sua sponte* grant leave to amend after dismissing a plaintiff's pleading the first time. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). The Court allowed amendment after dismissing the Amended Complaint on August 1, 2018, and need not do so again. (Doc. 34). Moreover, each claim fell well short of the plausibility threshold, thus the Court finds that amendment would be futile. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (stating a district court need not allow amendment where amendment would be futile). The SAC is thus due to be dismissed with prejudice.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Dispositive Motion to Dismiss (Doc. 49) is **GRANTED**. The Second Amended Complaint (Doc. 37) is **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to close the file.

**DONE AND ORDERED** in Orlando, Florida on November 14, 2018.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record